IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
COLUMBIA DIVISION

| | |
|---|---|
| LARRY BOOTH BARLAR, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 1:10-0039 |
| ) | Judge Trauger |
| MARSHALL COUNTY BOARD OF ) | |
| EDUCATION and STAN CURTIS, ) | |
| ) | |
| Defendants. ) | |

**MEMORANDUM AND ORDER**

Pending before the court is the defendants' Motion for Summary Judgment (Docket No. 31), to which the plaintiff has responded (Docket No. 38), and the defendants have filed a reply in support (Docket No. 40). For the reasons discussed herein, the defendants' motion will be granted in part and denied in part.

**BACKGROUND**

The plaintiff, Larry Booth Barlar, was hired by the defendant, the Marshall County Board of Education (MCBOE), as a full-time bus driver in October 2006.[1] Upon his hire, the plaintiff was assigned to drive "Bus Route No. 35," which would be his route throughout his employment and which is comprised of a two-hour route in the morning and a two-hour route in the

---

[1] Unless otherwise noted, the facts are drawn from the parties' statements of material facts (Docket No. 38 Ex. 5) and related affidavits and exhibits. Although facts are drawn from submissions made by both parties, on a motion for summary judgment, all inferences are drawn in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S 574, 586 (1986); *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).

1

afternoon. (Docket No. 1 at 3.). The plaintiff was employed by the MCBOE for three school years, 2006-2007, 2007-2008, and 2008-2009. In his final two years, the plaintiff's supervisor was Glenn Ezell. (Docket No. 32 at 3.)

The plaintiff has "chronic renal disease" and only one functional kidney. (Docket No. 38 Ex. 5 at 4.) This condition requires the plaintiff to take diuretics and to drink an above average amount of water each day, which forces him to frequently and urgently need to urinate. Ezell's girlfriend and the plaintiff have a similar affliction, and Ezell was apparently well aware of the plaintiff's medical condition and discussed it with him not uncommonly. As a condition of maintaining his bus driving license, the plaintiff submitted to a yearly medical examination. The reports from the yearly examinations consistently note the plaintiff's condition but place no restrictions on his activities. (See Docket No. 32 Ex. C.)

The plaintiff generally had strong performance evaluations; in the final evaluation given by Ezell, the plaintiff received "outstanding" marks in all categories except in the "works well with others" category, in which the plaintiff received a 3 out of 4. (Docket No. 38 Ex. 5 at 2.) The defendants suggest that the reason for this lower mark is that, during the 2008-2009 year, Ricky Hancock, who substituted for the plaintiff on his bus route over a few days, noticed that some of the plaintiff's students/passengers sprayed air freshener in the bus while it was in motion. Hitchcock maintained that this was done at the plaintiff's direction in an attempt to control the odor generated by one of the students. While there is some dispute as to whether Hitchcock complained to Ezell about this, there is no dispute that the plaintiff complained about this student and the odor to both Hitchcock and Ezell.

There appears to be no dispute that "Bus Route No. 35" is a relatively long bus route,

2

although there is some dispute over whether it is actually the longest in the system in terms of time and distance.[2] The plaintiff maintains that, in conjunction with his many conversations with Ezell about his condition, he asked Ezell for a shorter bus route. During his deposition, the plaintiff specifically testified that, in both February 2009 and April 2009, he asked Ezell for a shorter bus route, but he never received one, despite Ezell's assurances that Ezell would "take care of it." (Docket No. 38 Ex. B at 152-153, 234-235.)

Other trouble arose during the 2008-2009 year. That is, Randy Lowe, a bus mechanic for the MCBOE, claims that, years earlier, Ezell had promised him a promotion and a certain raise. While Lowe received the promotion and some raise around this time, it was not as much as Ezell had promised. Also, Lowe believed that Ezell gave a promotion and raise to another mechanic who was not deserving.

According to the affidavit of Mitchell Byrd, who was the MCBOE Human Resources Director during the 2008-2009 year, following these events, Lowe, along with compatriot and School Board Member Curt Denton, began filing "almost weekly complaints and/or allegations" against Ezell with Human Resources, including that Ezell was improperly selling bus tires for personal gain and that Ezell was not reporting sick leave appropriately. (Docket No. 32 Ex. 2 at 1-2.) Byrd states that he investigated these allegations and that they were all determined to be

---

[2]In April 2009, Bus Route No. 37 became available and was posted for open sign up, pursuant to the policy of the MCBOE Transportation Department. The sign up sheets are in the record here, and it does not appear that the plaintiff's name is on the sign-up sheets. (Docket No. 32 Ex. E) The plaintiff maintains that he did sign up for Bus Route No. 37, and the sign-up sheets must have been doctored. (Docket No. 38 Ex. 5 at 12.) There does not appear to be any other evidence to support this allegation, and there was considerable testimony that Bus Route No. 37, in at least some respects, is longer than Bus Route No. 35. (*See id.*) As can be seen from the discussion below, it is not necessary to resolve these controversies surrounding Bus Route No. 37 in order to rule on the plaintiff's reasonable accommodation claim.

essentially baseless. (*Id.*)

According to Byrd, each time Lowe and Denton made a complaint, the plaintiff "was constantly referred to as someone who had witnessed or had knowledge of the allegations and was supporting Denton and Lowe." (*Id*. at 1-2.) Therefore, Byrd states, the plaintiff was "without question, involved with Denton and Lowe in trying to have Ezell fired or make his job so difficult he would resign." (*Id*. at 3.)

The plaintiff admitted to being "critical" of Ezell during the 2008-2009 year, but he denies "encouraging anyone to fire him." (Docket No. 38 Ex. 5 at 9.) Both Ezell and Byrd recounted numerous discussions during this time period in which they (along with Director of Schools/defendant Stan Curtis) discussed a "witch hunt" to force Ezell out of his job. (*Id.* at 9-10.) At the end of the 2008-2009 year, Ezell recommended that the plaintiff's contract not be renewed for the following year, and that recommendation was followed by Curtis, who informed the plaintiff (along with others, including Lowe) of the non-renewal on June 9, 2009. (Docket No. 32 at 8; Docket No. 1.at 4.)

Delinda Owens was a member of the Marshall County School Board from 2008 to 2011. In her affidavit, Owens maintains that, immediately after the plaintiff's contract was not renewed, the plaintiff contacted her "about his non-renewal and advised [her] of his three performance evaluations and suggested that [she] look at his file and confirm for [herself]." (Docket No. 32 Ex. 4 at 1.) Owens maintains that, during this time, there was "concern" on the Board about whether Curtis's employment decisions "were for the betterment of the school system." (*Id*. at 2.) Therefore, Owens claims, she requested a copy of the plaintiff's employment file from the "Central Office," and, when she arrived at the Board Meeting on June

4

11, 2009, which the plaintiff also attended, the file was waiting in her chair. (*Id.*) Owens claims that she put the file in front of her until the meeting ended. (*Id.*)

After the meeting ended, Owens claims, the plaintiff approached her and asked her if the packet in front of her was his file; Owens responded that it was, and they began leafing through it. (*Id.*) According to Owens, the plaintiff then noticed that his partially un-redacted "medical exam sheet" was in his file. (*Id.*) Owens states that the plaintiff then began announcing to the several individuals remaining in the room that "they" had given Owens a copy of his medical records and that he had been subject to a HIPAA violation. (*Id.*) Owens returned the file to the Central Office the next day.[3] (*Id.* at 3.) On May 10, 2010, the plaintiff filed his Complaint. (Docket No. 1.)

## ANALYSIS

In his Complaint, the plaintiff asserts (1) an Americans with Disabilities Act (ADA) claim against the MCBOE for failing to make a "reasonable accommodation" for his disability pursuant to 42 U.S.C. § 12112(b)(5)(A); (2) a Tennessee Disability Act claim, T.C.A. § 8-50-103, against the MCBOE for terminating the plaintiff due to a disability; and (3) a common law invasion of privacy claim against the MCBOE and Curtis for the events related to the "release" of his medical information at the June 11, 2009 Board meeting. (Docket No. 1 at 5-6.)

**I.     Summary Judgment Standard**

Federal Rule of Civil Procedure 56 requires the court to grant a motion for summary

---

[3]There was additional information provided by Byrd and Owens more precisely explaining (1) the circumstances under which the plaintiff's file was ordered, (2) the details as to how the file was organized and its information protected, and (3) whether Owens paid the fee to have the file copied. (See Docket No. 32 Exs. 2 and 4.) It is not necessary to fully explain this testimony, as can be seen from the discussion below of the plaintiff's invasion of privacy claim.

judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists when there are "disputes over facts that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). If a moving defendant shows that there is no genuine issue of material fact as to at least one essential element of the plaintiff's claim, the burden shifts to the plaintiff to provide evidence beyond the pleadings, "set[ting] forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren,* 578 F.3d 351, 374 (6th Cir.2009); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986). "In evaluating the evidence, the court must draw all inferences in the light most favorable to the [plaintiff]." *Moldowan,* 578 F.3d at 374.

At this stage, "'the judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.'" *Id.* (quoting *Anderson*, 477 U.S. at 249). But "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient," and the plaintiff's proof must be more than "merely colorable." *Anderson,* 477 U.S. at 249, 252. An issue of fact is "genuine" only if a reasonable jury could find for the plaintiff. *Moldowan,* 578 F.3d at 374 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574 (1986)).

## II. The Defendant's Motion for Summary Judgment

### A. ADA Claim

A covered employer, such as the MCBOE, violates the ADA if it does not make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity

6

can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." 42 U.S.C. § 12112(b)(5)(A). The Sixth Circuit has recognized that a plaintiff may prevail on a "failure to accommodate" claim if he shows that (1) he is disabled; (2) he was qualified for the job with or without reasonable accommodation; and (3) he was denied a reasonable accommodation. *Penny v. United Parcel Serv.*, 128 F.3d 408, 414 (6th Cir. 1997); *Cantrell v. Nissan N.A.*, 145 Fed. Appx. 99, 104 (6th Cir. 2005).

The MCBOE does not dispute that the 2009 Amendments to the ADA guide the court here or that, pursuant to those amendments, the plaintiff's kidney and bladder difficulties qualify him as "disabled" under the ADA. (*See* Docket No. 32 at 14; *see also* 42 U.S.C. § 12102(2)(B)). The MCBOE also does not dispute that the plaintiff was "qualified" for his position. (Docket No. 32 at 14.) Rather, the MCBOE solely argues that "there is no credible evidence that the Plaintiff at any time requested an accommodation for his frequent need to urinate from his supervisor, Glenn Ezell." (*Id.*) The MCBOE recognizes that the plaintiff specifically testified that he requested the shorter bus route, but the MCBOE maintains that the plaintiff's credibility is weakened because he also stated that fellow mechanic Randy Lowe was there when he made his request, but Lowe, at his deposition, denied that he was present for any such request.[4] (*Id.*)

In response, the plaintiff points to his deposition testimony, in which he testified that he discussed his condition at length with Lowe and, on at least two occasions, specifically requested a shorter bus route. (Docket No. 38 at 8-9.) The evidence in the record, then, simply amounts to the plaintiff's sworn testimony that he requested a reasonable accommodation (a shorter bus

---

[4]The relevant testimony from Lowe's deposition does not appear to be in the record. (*See* Docket No. 33 Ex. 5; Docket No. 38 Ex. C.)

route) versus the defendants' unsupported argument that he did not. As the plaintiff correctly argues, "the simple fact [is] that there is a genuine dispute as to whether these accommodation requests were made, and the defendants cannot ask the court to simply take their word over the Plaintiff's." (*Id.* at 9.) The MCBOE has hung its entire argument on this issue, and, therefore, the court will not dismiss the ADA claim on summary judgment.

B.     **TDA Claim**

Again, the plaintiff's claim under the TDA maintains that his non-renewal was motivated by his disability. (Docket No. 1 at 5.) As a preliminary matter, the court finds that the plaintiff's TDA disability discrimination claim is evaluated under the same standard as the ADA.[5] *See Chandler v. Speciality Tires*, 134 Fed. Appx. 921, 925 (6th Cir. 2005)). That is, in the absence of direct evidence of discrimination, in order to establish a *prima facie* claim of disability discrimination, the plaintiff must show (1) that he is "disabled" within the meaning of the ADA; (2) that he was qualified to perform the requirements of the job; and (3) that he suffered an adverse employment decision because of the disability. *Talley v. Family Dollar*

---

[5]It has been well settled that ADA and TDA claims for disability discrimination are analyzed under the same standard. *Chandler*, 134 Fed. Appx. at 925. And the MCBOE does not dispute that the *prima facie* test and burden-shifting framework are the same under the ADA and the TDA. (Docket No. 32 at 10, Docket No. 40 at 1-3.) However, the MCBOE argues that, because the "Tennessee legislature has not adopted or amended" the relevant Tennessee civil rights laws to specifically embrace the 2009 ADA Amendments (including the broader definitions of the factors that influence the "disability" determination), the TDA and ADA are now "very dissimilar" in terms of how they treat the "threshold" issue of disability. (Docket No. 32 at 12-13.) It appears that, in cases in which the 2009 ADA Amendments are relevant, district courts continue to analyze ADA claims and TDA claims identically. *See Harvey v. America's Collectibles Network*, 2011 WL 182864, *1 (E.D. Tenn. Jan. 20, 2011); *White v. Interstate Distributor Co.*, 2010 WL 5300872, *8 (M.D. Tenn. Dec. 17, 2010)(Haynes, J.) Therefore, as disability and qualification were conceded by the defendants on the ADA claim, they are considered conceded on the TDA claim as well. As can be seen below, however, the plaintiff's TDA claim still fails.

8

*Stores of Ohio, Inc.*, 542 F.3d 1099, 1105 (6th Cir. 2008). This final prong ultimately incorporates or leads to an analysis under the familiar *McDonnell Douglas* burden-shifting framework, in which, in response to the evidence of discrimination, the defendant must articulate a non-discriminatory reason for its actions, and then it is the plaintiff's burden to demonstrate that the proffered explanation is pretextual. *Id*.

The record from this case simply provides no support for the notion that the plaintiff was non-renewed because of his disability. Rather, the MCBOE has come forth with considerable evidence that, in addition to the trouble concerning the odor problem on the bus, the plaintiff had become a "thorn in the side" of Ezell – part of a group that was lobbying and working to get Ezell fired – and Ezell responded by non-renewing the plaintiff and at least one other in that group. In response to this evidence, the plaintiff simply states that these reasons were not articulated to him until the litigation began. (Docket No. 38 at 8.) Again, the key point is a simple one – there is no evidence supporting a connection between the plaintiff's termination and his kidney ailment.[6] Therefore, the plaintiff's TDA claim fails and will be dismissed.

### C. Invasion of Privacy Claim

While the defendant makes more complicated arguments (such as Tennessee Governmental Tort Liability Act immunity) in support of dismissing this claim, the analysis need not even reach that point. (Docket No. 32 at 17.) The crux of the "invasion of privacy" argument is that, after the plaintiff asked Owens to look into his employment record, Owens

---

[6]While the parties do not raise the issue, this court has determined that *Gossett v. Tractor Supply Company, Inc.*, 320 S.W. 3d 777 (Tenn. 2010) does not influence the court's analysis where the plaintiff, as here, has failed to make out a *prima facie* case of discrimination. *See Boges v. GM*, 2011 WL 1595485, *6-7 (M.D. Tenn. Apr. 27, 2011).

9

requested the file, the MCBOE released the plaintiff's file to Owens and, while Owens was reviewing the file with the plaintiff after the Board meeting, the file was opened to a place where unredacted personal information could, in theory, be seen by others remaining in the room. (Docket No. 38 at 9-12.)

The basic elements of an invasion of privacy claim are that the (1) defendant intentionally and improperly intruded upon the plaintiff's private affairs or seclusion; (2) the intrusion would be seen as "highly offensive" to a reasonable person; and (3) the intrusion caused injury or loss to the plaintiff. *See Givens v. Mullikin*, 75 S.W.3d 383, 412 (Tenn. 2002). On the facts presented surrounding the June 11, 2009 Board meeting, no reasonable juror could find any of these elements satisfied. Indeed, the facts presented provide no indication that the defendants engaged in any tortious or wrongful conduct in regard to the events surrounding the June 11, 2009 Board meeting.[7]

The defendants' Motion for Summary Judgment (Docket No. 31) is **GRANTED IN PART and DENIED IN PART**. The case will proceed as an ADA "failure to accommodate" case against the MCBOE. All other claims and defendants are hereby **DISMISSED.**

---

[7]The plaintiff suggests that the defendants could have liability under a "public disclosure of private facts" theory. (Docket No. 38 at 9-12.) The case law cited by the plaintiff, however, provides that this is not a viable theory of recovery where the disclosure of personal information is made to one person or "a small group of people." *Beard v. Akzona*, 517 F. Supp. 128, 132 (E.D. Tenn. 1981). While it does not appear that any public disclosure of private information occurred here, to the extent that it did, it was to a small group of people .

It is so Ordered.

Enter this 6th day of June 2011.

ALETA A. TRAUGER
United States District Judge